KENNEDY, JENNIK & MURRAY, P.C.
*Attorneys for Plaintiffs*
113 University Place, 7th Floor
New York, New York 10003
Tel. (212) 358-1500

**14 CV — 8326**

RECEIVED

SEP 1 7 2014

U.S.D.C.S.D.N.Y.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Terrence Moore, Kevin Kelly, John Coffey, Ronald Richardson, John
Brunetti, Kevin O'Brien, Michael Smith, and Michael Cahill as Trustees of
the Metal Lathers Local 46 Pension Fund, Metal Lathers Local 46 Trust
Fund, Metal Lathers Local 46 Annuity Fund, Metal Lathers Local 46
Vacation Fund, Metal Lathers Local 46 Apprenticeship Fund, and Metal
Lathers Local 46 Scholarship Fund,

and

Alexander J. Castaldi, Maurice Foley, Jose Anthony Ortiz, Angelo
Angelone, John Brunetti, Eric Lee, Michael Cahill, and Michael Salgo as
Trustees of the Cement & Concrete Workers Pension Trust Fund, Cement &
Concrete Workers Welfare Trust Fund, Cement & Concrete Workers
Annuity Trust Fund, Cement & Concrete Workers Scholarship Trust Fund,
and Alexander J. Castaldi, Kieran O'Sullivan, John Brunetti, and Michael
Cahill as Trustees of the Cement & Concrete Workers Training and
Education Trust Fund,

and

Gino Castignoli, Michael Rendina, Robert Bertuzzi, Eddie Barbaria, Frank
Martorano, Jr., John Brunetti, Joseph Mitrione, Michael Salgo, and Kevin
O'Brien as Trustees of Cement Masons' Local 780 Trust Fund, Cement
Masons' Local 780 Pension Fund, Cement Masons' Local 780 Annuity
Fund, Cement Masons' Local 780 Vacation Fund, Cement Masons' Local
780 Apprenticeship Fund,

and

Joseph Geiger, Stephen McInnis, Michael Cavanaugh, Paul Capurso, John
Sheehy, Paul Tyzner, David Meberg, Kevin O'Callaghan, Paul O'Brien,
John DeLollis, Joseph Kaming, and Catherine Condon as Trustees of the
New York City District Council of Carpenters Pension Fund, New York
City District Council of Carpenters Welfare Fund, New York City District
Council of Carpenters Apprenticeship Journeyman Retraining, Educational
and Industry Fund, and the New York City District Council of Carpenters
Annuity Fund,

Plaintiffs,

**-against-**

Navillus Tile, Inc., d/b/a Navillus Contracting, Advanced Construction
Solutions, LLC, d/b/a ACS-NY LLC, Time Square Construction, Inc.,
Donal O'Sullivan, Kevin O'Sullivan, and Helen O'Sullivan,

Defendants.

JUDGE McMAHON

Case No. _____

**COMPLAINT**

Plaintiffs, Terrence Moore, Kevin Kelly, John Coffey, Ronald Richardson, John Brunetti, Kevin O'Brien, Michael Smith and Michael Cahill as Trustees of the Metal Lathers Local 46 Pension Fund, Metal Lathers Local 46 Trust Fund, Metal Lathers Local 46 Annuity Fund, Metal Lathers Local 46 Vacation Fund, Metal Lathers Local 46 Apprenticeship Fund and Metal Lathers Local 46 Scholarship Fund; Alexander J. Castaldi, Maurice Foley, Jose Anthony Ortiz, Angelo Angelone, John Brunetti, Eric Lee, Michael Cahill, and Michael Salgo as Trustees of the Cement and Concrete Workers Pension Trust Fund, Cement and Concrete Workers Welfare Trust Fund, Cement and Concrete Workers Annuity Trust Fund, Cement and Concrete Workers Scholarship Trust Fund and Alexander J. Castaldi, Kieran O'Sullivan, John A. Brunetti, and Michael Cahill as Trustees of the Cement and Concrete Workers Training and Education Trust Fund; Gino Castignoli, Michael Rendina, Robert Bertuzzi, Eddie Barbaria, Frank Martorano, Jr., John Brunetti, Joseph Mitrione, Michael Salgo, and Kevin O'Brien as Trustees of Cement Masons' Local 780 Trust Fund, Cement Masons' Local 780 Pension Fund, Cement Masons' Local 780 Annuity Fund, Cement Masons' Local 780 Vacation Fund, Cement Masons' Local 780 Apprenticeship Fund; and Joseph Geiger, Stephen McInnis, Michael Cavanaugh, Paul Capurso, John Sheehy, Paul Tyzner, David Meberg, Kevin O'Callaghan, Paul O'Brien, John DeLollis, Joseph Kaming, and Catherine Condon as Trustees of the New York City District Council of Carpenters Pension Fund, New York City District Council of Carpenters Welfare Fund, New York City District Council of Carpenters Apprenticeship Journeyman Retraining, Educational and Industry Fund, and the New York City District Council of Carpenters Annuity Fund, by their attorneys, Kennedy, Jennik & Murray, P.C., complain of Defendants, Navillus Tile, Inc. d/b/a Navillus Contracting ("Navillus"), Advanced Construction Solutions, LLC, d/b/a ACS-NY LLC

2

("ACS"), Time Square Construction, Inc. ("Time Square"), Donal O'Sullivan, Kevin O'Sullivan, and Helen O'Sullivan as follows:

## INTRODUCTION

1.       This is an action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.,* and under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, by Trustees of multiemployer benefit funds sponsored by Local 46 Metallic Lathers and Reinforcing Ironworkers Union ("Local 46"); the Cement and Concrete Workers District Council, LIUNA ("Cement Workers"); Cement Masons Local 780; and New York City District Council of Carpenters ("Carpenters") to recover benefit fund contributions owed to them pursuant to various collective bargaining agreements and trust fund documents from an employer and its alter ego entities, as well as its principal officers, who fraudulently schemed to avoid those contributions by establishing alter ego entities to perform work plainly covered by the employer's collective bargaining agreements with Local 46, the Cement Workers, Cement Masons Local 780, and the Carpenters.

## JURISDICTION AND VENUE

2.       The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 29 U.S.C. §§ 1132(a)(3), 1132(e)(1), and 1132(f).

3.       This Court also has jurisdiction under § 301 of the LMRA, 29 U.S.C. § 185 in that certain of Defendants' actions violated collective bargaining agreements between an employer and labor organizations.

4.       Venue lies in this District under 29 U.S.C. § 1132(e)(1) and 29 U.S.C. § 185(a), as a substantial number of the violations of ERISA occurred in this district and Plaintiffs Local 46 Funds and Carpenters Funds (as defined below) are administered in this district.

3

## THE PARTIES

5.      Metal Lathers Local 46 Pension Fund, Metal Lathers Local 46 Trust Fund, Metal
Lathers Local 46 Annuity Fund, Metal Lathers Local 46 Vacation Fund, Metal Lathers Local 46
Apprenticeship Fund, and Metal Lathers Local 46 Scholarship (collectively, "Local 46 Funds"),
are "employee benefit plans" and "multiemployer plans" within the meaning of 29 U.S.C. §
1002(3) and (37), with their principal place of business at 260 East 78th Street, New York, NY
10021. The Local 46 Funds are jointly administered by a Board of Trustees, comprised of an
equal number of labor and management representatives in accordance with § 302(c)(5) of the
LMRA, 29 U.S.C. § 186(c)(5). The Trustees of the Local 46 Funds are Terrence Moore, Kevin
Kelly, John Coffey, Ronald Richardson, John Brunetti, Kevin O'Brien, Michael Smith, and
Michael Cahill.

6.      The Cement and Concrete Workers Pension Trust Fund, Cement and Concrete
Workers Welfare Trust Fund, Cement and Concrete Workers Annuity Trust Fund, Cement and
Concrete Workers Scholarship Trust Fund, and the Cement and Concrete Workers Training and
Education Trust Fund (collectively, "Cement Workers Funds") are "employee benefit plans" and
"multiemployer plans" within the meaning of 29 U.S.C. § 1002(3) and (37), with their principal
place of business at 35-30 Francis Lewis Boulevard, 2nd Floor, Flushing, NY 11358. The
Cement Workers Funds are jointly administered by a Board of Trustees, comprised of an equal
number of labor and management representatives in accordance with § 302(c)(5) of the LMRA,
29 U.S.C. § 186(c)(5). The Trustees of the Cement Workers Funds are Alexander J. Castaldi,
Maurice Foley, Jose Anthony Ortiz, Angelo Angelone, John Brunetti, Eric Lee, Michael Cahill,
Michael Salgo, and Kieran O'Sullivan.

4

7.    The Cement Masons' Local 780 Trust Fund, Cement Masons' Local 780 Pension Fund, Cement Masons' Local 780 Annuity Fund, Cement Masons' Local 780 Vacation Fund, and the Cement Masons' Local 780 Apprenticeship Fund (collectively, "Local 780 Funds") are "employee benefit plans" and "multiemployer plans" within the meaning of 29 U.S.C. § 1002(3) and (37), with their principal place of business at 1983 Marcus Avenue, Suite C116, New Hyde Park, NY 11042. The Local 780 Funds are jointly administered by a Board of Trustees, comprised of an equal number of labor and management representatives in accordance with § 302(c)(5) of the LMRA, 29 U.S.C. § 186(c)(5). The Trustees of the Local 780 Funds are Gino Castignoli, Michael Rendina, Robert Bertuzzi, Eddie Barbaria, Frank Martorano, Jr., John Brunetti, Joseph Mitrione, Michael Salgo, and Kevin O'Brien.

8.    The New York City District Council of Carpenters Pension Fund, New York City District Council of Carpenters Welfare Fund, New York City District Council of Carpenters Apprenticeship Journeyman Retraining, Educational and Industry Fund, and the New York City District Council of Carpenters Annuity Fund (collectively, "Carpenters Funds") are "employee benefit plans" and "multiemployer plans" within the meaning of 29 U.S.C. § 1002(3) and (37), with their principal place of business at 395 Hudson Street, New York, NY 10014. The Carpenters Funds are jointly administered by a Board of Trustees, comprised of an equal number of labor and management representatives in accordance with § 302(c)(5) of the LMRA, 29 U.S.C. § 186(c)(5). The Trustees of the Carpenters Funds are Joseph Geiger, Stephen McInnis, Michael Cavanaugh, Paul Capurso, John Sheehy, Paul Tyzner, David Meberg, Kevin O'Callaghan, Paul O'Brien, John DeLollis, Joseph Kaming, and Catherine Condon.

5

9.      Navillus Tile, Inc., d/b/a Navillus Contracting ("Navillus") is a New York
Corporation located at 575 Fifth Avenue, New York, NY 10017. The owners of Navillus are
Donal O'Sullivan and Kevin O'Sullivan.

10.     Advanced Contracting Solutions, LLC ("ACS") was formed as a limited liability
corporation in Delaware on September 5, 2013. On September 30, 2013, ACS filed as a foreign
corporation in New York State under the name ACS-NY. On December 13, 2013 and May 14,
2014, ACS registered with the NYC Department of Buildings, stating its location as 314 East
41st Street, Apt. #103C, New York, NY 10017, a residential apartment owned by Kathleen
O'Sullivan who, on information and belief, is the wife of Donal O'Sullivan.

11.     Time Square Construction, Inc. ("Time Square") is a New York corporation with
offices at 355 Lexington Avenue, New York, NY 10017. The owners of Time Square are Donal
O'Sullivan, Kevin O'Sullivan, and Helen O'Sullivan.

## STATEMENT OF RELEVANT FACTS

12.     Navillus is a member of the Building Contractors Association, Inc. ("BCA") and a
member of the Hoisting and Scaffolding Trade Association, Inc. ("HASTA"). The BCA and
HASTA are trade organizations, and one or both is party to various collective bargaining
agreements with Local 46, Cement Masons Local 780, and the Carpenters (the "Local 46
Contract," "Cement Masons Local 780 Contract," and the "Carpenters Contracts," respectively).
The Cement Workers entered into an independent collective bargaining agreement with Navillus
("the Cement Workers Contract"). (The "Local 46 Contract," "Cement Masons Local 780
Contract," the "Carpenters Contracts," and the "Cement Workers Contract" are herein
collectively referred to as the "Union Contracts.")

6

13.     The relevant Local 46 Contract with the BCA became effective on July 1, 2008 and expired on June 30, 2014 and was renewed so that it remains in effect today.  The relevant Cement Workers Contract with Navillus became effective on July 1, 2008 and was renewed effective July 1, 2011 and July 1, 2014 and remains in effect today.  The relevant Cement Masons Local 780 Contract with the BCA became effective on July 1, 2008 and was renewed effective July 1, 2011 and again, on July 1, 2012 and remains in effect today.  The relevant Carpenters Contract with the BCA became effective on July 1, 2006 and was renewed effective July 1, 2011 and remains in effect today. The relevant Carpenters Contract with HASTA became effective July 1, 2011 and is not due to expire until June 30, 2016.

14.     The Union Contracts require that Navillus make periodic contributions to the multiemployer pension, health and welfare funds set forth in each Contract for each hour of covered work as defined in each of the Union Contracts.  Navillus has breached the Union Contracts by engaging in covered work through a variety of alter ego entities that were established for the sole purpose of allowing it to perform covered work without complying with its obligations under the Union Contracts.

**The Collective Bargaining Agreements**

**The Local 46 Contract**

15.     On July 1, 2008, Local 46 and the BCA entered into a collective bargaining agreement, attached hereto as Exhibit A, which remained in effect until June 30, 2014 and has since been renewed by Local 46 and the BCA.  Article III of that Local 46 Contract, entitled "Work Covered," clearly defines lather work as work that should be performed by individuals represented by Local 46.  Article III also states that "[t]he Employer further agrees that the work

7

described in all the paragraphs of this Article III shall be contracted for the Employer and shall

be assigned to and performed by Journeymen Lathers represented by the Union."

16.     Article XII of the Local 46 Contract imposes clear obligations to contribute to the

Local 46 Funds for every hour of work by Navillus or its alter egos performing covered work

under the Local 46 contract.

17.     Article XIX of the Local 46 Contract, entitled "Coverage of Lathing Work,"

provides that:

> It is agreed that if any Employer contracts for or performs lathing work falling within the
> jurisdiction of the Union, as such jurisdiction is set forth in the Union's Collective
> Bargaining Agreement with the Employing Metallic Furring and Lathing Contractors
> Association of New York, the Employer agrees that it will assign such work to
> Employees represented by the union ... The Employer must not subcontract bargaining
> unit work, unless the subcontractor receiving the subcontract is bound and obligated
> under this Agreement.

**The Cement Workers Contract**

18.     The Cement Workers and Navillus entered into an independent collective

bargaining agreement, effective July 1, 2008 to June 30, 2011, which was renewed on July 1,

2011 and again on July 1, 2014 (which is attached hereto as Exhibit B).  Article VII of the

Cement Workers Contract is entitled "Work Covered" and it defines the work covered by the

Contract, which is summarized in Section 4 as follows: "The Union shall have jurisdiction over

all reinforced concrete in all jobs, including alteration jobs, foundation building jobs and steel

structures."

19.     The Cement Workers Contract imposes clear obligations to contribute to the

Cement Workers Funds for every hour of work by Navillus or its alter egos performing covered

work under the Cement Workers Contract.

8

20. The Cement Workers Contract also makes clear that Covered Work performed in the City of New York by any signatory employer, or a related company, imposes obligations on the signatory employer as well as: (i) any other entity where the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision and/or ownership, wherein the signatory employer exercises either directly or indirectly any significant degree of ownership management or control, and (ii) any principal of the signatory employer who has discretionary authority over the payment of contributions to the Cement Workers Funds for Covered Work. The relevant provisions are Article I, Section 1, Article III, Sections 2, 3, 5 and 6, Article XI, Section 11(e), and Article XIX, Sections 1 and 2. Article XI, Section 11(e) provides for personal liability of officers and owners of employers for contributions owed to the Cement Workers Funds, as follows:

e) The President, Vice President, Secretary-Treasurer, individual partner, employee of partnership, officer, stockholder, proprietor or employee of the corporation, company, joint venture or proprietorship acknowledges that he or she is vested with the authority and control over the submission of reports and/or payment of contributions to the C&CWDC Fringe Benefit Funds and acknowledges that he or she shall be personally or individually obligated to submit the required reports and/or pay the required contributions to the C&CWDC Fringe Benefit Funds for all work performed by Employees.

**The Cement Masons Local 780 Contract**

21. The Cement Masons Local 780 and the BCA entered into a collective bargaining agreement, effective July 1, 2008 and attached hereto as Exhibit C, which was renewed on July 1, 2011. Article IV of the Cement Masons Local 780 Contract entitled "Work Covered" defines the work covered by the Contract.

22. Article VI of the Cement Masons Local 780 Contract imposes clear obligations to contribute to the Local 780 Funds for every hour of work by Navillus or its alter egos performing covered work under the Cement Masons Local 780 Contract.

9

23.     The Cement Masons Local 780 Contract also makes clear that Covered Work

performed in the City of New York by any signatory employer, or a related company, imposes

obligations on the signatory employer as well as: (i) any other entity where the two enterprises

have substantially identical management, business purpose, operation, equipment, customers,

supervision and/or ownership, wherein the signatory employer exercises either directly or

indirectly any significant degree of ownership management or control, and (ii) any principal of

the signatory employer who has discretionary authority over the payment of contributions to the

Local 780 Funds for Covered Work. The relevant provisions are Article II, Sections 12 and 14,

Article III and Article VI, Sections 2(d), 3(c) and Article XV, Sections 7 and 8.  Article VI,

Section 3(g) imposes personal liability on officers, owners and employees of the employers for

the proper payment of contributions to the Local 780 Funds, as follows:

> The President, Vice President, Secretary-Treasurer, individual partner, employee of the
> partnership, officer, stockholder, proprietor or employee of the corporation, company,
> joint venture or proprietorship acknowledges that he or she is vested with the authority
> and control over the submission of reports and/or payment of contributions to the United
> Cement Masons' Funds and acknowledges that he or she shall be personally and
> individually obligated to submit the required reports and/or pay the required contributions
> to the United Cement Masons' Funds for all work performed by Employees and the
> individual signing this Agreement has the authority so to bind them and they are so
> bound pursuant to 29 U.S.C.§ 1002(5) and§ 1145.

Article XV, Section 8 of the Cement Masons Local 780 Contract provides as follows:

> If an Employer covered by this Agreement or any such owner or principal forms or
> acquires by purchase, merger or otherwise, an interest, whether by ownership, stock,
> equitable or managerial, in another company, corporation, partnership or joint venture,
> performing bargaining unit work within this jurisdiction, this Agreement shall cover such
> other operation and such other bargaining unit Employees shall be considered an
> accretion to the bargaining unit.

### The Carpenters Contracts

#### *The Building Contractors Association Agreement*

24.     On July 1, 2006, the Carpenters and the BCA entered into a collective bargaining agreement, which was renewed on July 1, 2011 and is attached hereto as Exhibit D and remains in effect today (the "Carpenters BCA Contract"). Article IV of the Carpenters BCA Contract is entitled "Work Covered" and defines the work covered by the Carpenters BCA Contract.

25.     Article XVI of the Carpenters BCA Contract imposes clear obligations to contribute to the Carpenters Funds for every hour of work by Navillus or its alter egos performing covered work under the Carpenters BCA Contract.

26.     The Carpenters BCA Contract also makes clear that Covered Work performed in the City of New York by any signatory employer, or a related company, imposes obligations on the signatory employer as well as: (i) any other entity where the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision and/or ownership, wherein the signatory employer exercises either directly or indirectly any significant degree of ownership management or control, and (ii) any principal of the signatory employer who has discretionary authority over the payment of contributions to the Carpenters Funds for Covered Work. The relevant provisions are Article III, Section 5, Article VIII, Article IX, and Article X. In addition, Article XVIII, Section 19(a) provides as follows:

> In order to protect and preserve, for the employees covered by this Agreement, all work heretofore performed by them, and in order to prevent any device or subterfuge to avoid the protection and preservation of such work, it is hereby agreed as follows: If and when the Employer shall perform any work of the type covered by this Agreement, under its own name or under the name of another, as a corporation, company, partnership, or any other business entity, including a joint venture, wherein the Employer exercises either directly or indirectly any significant degree of ownership management or control, the terms and conditions of this Agreement including Fringe Benefits shall be applicable to all such work.

11

### *The Hoisting and Scaffolding Trade Association Agreement*

27.     On June 29, 2012, the Carpenters and HASTA entered into a collective bargaining agreement (the "Carpenters HASTA Contract"), attached hereto as Exhibit E, for the period July 1, 2011 to June 30, 2016. Article IV of the Carpenters HASTA Contract, entitled "Jurisdiction," sets forth the work covered under the agreement.

28.     Article IX, Section 1 of the Carpenters HASTA Contract imposes clear obligations on Navillus to make contributions to the Carpenters Funds for every hour of work by Navillus employees performing under the agreement. Moreover, Article IX, Section 3 of the agreement explicitly provides that "[e]ach Employer shall be bound by all the terms and conditions of the Agreements and Declarations of Trust, creating [the Carpenters Funds]" as amended, and requires Navillus to be bound by the bylaws adopted to regulate the Carpenters Funds.

29.     Article XI, Section 1 of the Carpenters HASTA Contract sets forth that, "The Employer stipulates that any firm, partnership or corporation, engaging in work normally covered by this Agreement in which it has or acquires a financial interest shall be bound by the terms of this Agreement." Article XI, Section 3, provides that, "The terms, covenants and conditions of this Agreement shall be binding on all Sub-Contractors at the site to whom [the Employer] may have sublet all or part of any contract entered into by any of the Contractors of [the Employer]."

30.     The Carpenters HASTA Contract, at Article IX, Section 1, also requires that "each Employer … make available to the Trustees of the [Carpenters Funds], or their designated auditing representatives, all pertinent books and records, including all cash disbursement records, required for an audit," and that "[i]n order to accomplish this end, it is specifically agreed that

12

should any affiliate or subsidiary Employer as described by this Agreement be involved with the business activities of this Employer that this Employer will make available all the pertinent books and payroll records of such affiliate or subsidiary to the auditor so that a complete audit can be made." (Emphasis added.)

31.     Lastly, a Side Letter to the Carpenters HASTA Contract—the provisions of which are effective July 1, 2011 to June 30, 2015—provides that any HASTA member "who may be signatory with [the Carpenters] through any other Collective Bargaining Agreement negotiated by [the Carpenters]" agrees that "all covered work within the [Carpenters HASTA Contract] will be performed exclusively under the terms and conditions" of the Carpenters HASTA Contract.

**ACS, Time Square, HDK, and Navillus Do the Same Concrete Construction Work**

32.     Navillus is a concrete construction company that employs carpenters, lathers, concrete laborers and concrete finishers to engage in concrete construction projects.

33.     ACS is also a concrete construction company that employs carpenters, lathers, concrete laborers and concrete finishers to engage in concrete construction projects. ACS performs work that is covered by the Local 46 and Concrete Workers CBAs.

34.     HDK Construction, LLC was formed as a limited liability company in Delaware on January 27, 2012. "HDK" stands for Helen, Donal, and Kevin O'Sullivan and is owned and controlled by them. HDK is a payroll company utilized by the O'Sullivans to perform administrative services for the O'Sullivan-owned and -operated companies that perform work covered by the Union Contracts while avoiding compliance with those agreements.

35.     On or about August 17, 2014, ACS posted the following advertisement for construction workers on the job-listing website Monster.com:

> Advanced Contracting Solutions, LLC, Long Island City, NY 11102
> Posted 3 days ago

13

> CONSTRUCTION JOBS Open Shop Concrete Contractor in NYC
> seeking experienced workers for the following trades; Formwork
> Carpenters, Concrete Laborers, Concrete Finishers, Lathers, Equipment
> Operators, Welders/Burners, Concrete/Safety Managers, Surveyors,
> Foremen/Superintendents, Project Managers, Assistant Project
> Managers. Must have valid OSHA 10 Hour & HAZCOM/GHS as well
> as NYC Dob 4 Hour.

(Last visited August 20, 2014.)

36.     On January 22, 2014, Time Square submitted a letter to the New York City

Department of Buildings ("NYC DOB") licensing unit seeking a Site Safety License in which

Time Square stated that the license applicant "was employed with Time Square Construction and

paid through payroll company HDK from October 1, 2012 through May 1, 2013." HDK and

Time Square have been joint insureds under the same Workers Compensation policy (National

Union Fire Insurance, Policy No. WC051756964).

37.     The January 22, 2014 correspondence sent by Time Square to the NYC DOB

stated that the applicant's duties "as Superintendent have included but not been limited to, all

concrete operations pertaining to the job site such as:"

- Always being present to oversee all concrete operations on the building where the concrete placement was 2,000 cubic yards or greater during the duration of the project.
- Coordinated directly with Site Safety manager on record for the project.
- Kept a daily log.
- Pouring, forming stripping and rebar typing *[sic, should be rebar "tying"]*.
- Ensuring that the assigned concrete testing laboratory and special inspector(s) were present.
- Performing inspections in accordance with the current concrete Safety Manager general inspections checklist prescribed by the Department.
- Installing framework, reinforcing framework, ensuring concrete reaches efficient strength.
- Reshoring concrete.

14

38.     On January 22, 2014, Navillus also sent a letter to the NYC DOB which used the

following <u>exact same language</u> as that found in the letter from Time Square (including the

typographic error relating to tying rebar) to describe its employee's duties as Superintendent:

- Always being present to oversee all concrete operations on the building where the concrete placement was 2,000 cubic yards or greater during the duration of the project.
- Coordinated directly with Site Safety manager on record for the project.
- Kept a daily log.
- Pouring, forming stripping and <u>rebar typing</u> *[sic]*.
- Ensuring that the assigned concrete testing laboratory and special inspector(s) were present.
- Performing inspections in accordance with the current concrete Safety Manager general inspections checklist prescribed by the Department.
- Installing framework, reinforcing framework, ensuring concrete reaches efficient strength.
- Reshoring concrete.

(Emphasis added.)

39.     On February 11, 2014, ACS sent a letter to the NYC DOB with, again, <u>the</u>

<u>following identical language</u> used in the Time Square and Navillus letters (including the same

typographic error relating to tying rebar) to describe its employee's duties as Superintendent:

- Always being present to oversee all concrete operations on the building where the concrete placement was 2,000 cubic yards or greater during the duration of the project.
- Coordinated directly with Site Safety manager on record for the project.
- Kept a daily log.
- Pouring, forming stripping and <u>rebar typing</u> *[sic]*.
- Ensuring that the assigned concrete testing laboratory and special inspector(s) were present.
- Performing inspections in accordance with the current concrete Safety Manager general inspections checklist prescribed by the Department.
- Installing framework, reinforcing framework, ensuring concrete reaches efficient strength.
- Reshoring concrete.

(Emphasis added.)

40.     The two letters dated January 22, 2014 and the letter dated February 11, 2014 from ACS, Time Square, and Navillus were not only identical in pertinent substance, they were signed by the same person for all three corporations, John Kuefner, and notarized by the same notary, Hazelyn Corcoran.

41.     ACS began its concrete construction work prior to its being formed as a limited liability corporation in Delaware. On September 3 and 4, 2013, ACS-NY LLC employees Stephen McKernan and Andrew Caliente were employed as laborers on ACS's Boston Road Residences project ("Boston Road Project") at 1191 Boston Road, Bronx, New York. ACS was not formed as a limited liability corporation in Delaware until September 5, 2013 and was not authorized to do business in New York until September 30, 2013 when ACS filed as a foreign corporation in New York State under the name ACS-NY.

42.     The total development cost for the Boston Road Project was $47.7 million. New York City provided $23.9 million in bond financing and $1.6 million in 4% Low Income Housing Tax Credits. This was a substantial project on which the concrete construction costs were undoubtedly several million dollars.

43.     On information and belief, ACS, as a not yet formed corporate entity, could not have obtained the substantial concrete construction contract for the Boston Road Project unless that job was actually obtained by Donal O'Sullivan and Kevin O'Sullivan as a Navillus project and then assigned by them, formally or otherwise, to ACS as their non-union concrete construction business. As a newly formed entity, ACS could not have obtained the necessary construction bond for the Boston Road Project without a guaranty from Navillus or Time Square.

16

**The Alleged Owner of ACS Is a Clerk with Five Months Experience in Concrete Field Work**

44.     Eoin Moriarty ("Moriarty") identifies himself as the owner of ACS. Moriarty was the controller at Navillus for six years before allegedly becoming the owner of ACS in 2013. On information and belief, Moriarty did not possesses sufficient expertise in the concrete industry to own a concrete construction company and secure contracts from developers for large projects. On April 8, 2013, only five months before ACS was formed, Donal O'Sullivan notified the Cement Workers that he had offered employment as a journeyman concrete laborer to Moriarty, with an address at 39-60 46th Street, Sunnyside, NY 11104.

45.     Moriarty, with only five months of field experience in concrete construction as of September, 2013, could not have obtained the concrete construction contracts for the projects at 400 155th Street, at 1191 Boston Road in the Bronx, at 551 West 21st Street in Manhattan, and at the City Point project on DeKalb and Flatbush Avenues in Brooklyn unless those contracts were bid for and acquired by Navillus and subsequently assigned to ACS, formally or otherwise, to perform.

46.     Moriarty is actually employed as a clerk by ACS. ACS was required to report each day that its employees worked on the Boston Road Project to the New York City Housing Preservation Development agency ("HPD"). On these daily reports to HPD, Moriarty identified himself as the ACS "Accounts Admin." Donal and Kevin O'Sullivan actually own and operate ACS.

47.     On or about May 9, 2014, the ACS employees working at the Boston Road Project were advised by Patrick Corcoran that the "big boss" was coming to the work site and that they should "look busy." On information and belief, the "big boss" of ACS who visited the Boston Road Project on May 9, 2014 was Donal O'Sullivan.

17

**ACS, Time Square, HDK, and Navillus Interchange the Same Concrete Construction Employees**

48.     In 2013 and 2014, ACS and Time Square performed work covered by the Union

Contracts at projects in New York City, including projects located at 400 155th Street, at 1191

Boston Road in the Bronx, at 551 West 21st Street in Manhattan, and at the City Point project on

DeKalb and Flatbush Avenues in Brooklyn. The concrete construction work performed on these

projects is identical to the work performed for decades on similar projects by Navillus.

49.     ACS and Time Square have used the same employees that Navillus uses to

perform concrete construction work. On various dates during the period October, 2013 to

February 4, 2014, ACS employed the following individuals to perform work covered by the

Local 46 Contract on the Boston Road Project: Ezequiel Arias, Julio Beniquez, Vincent

Cienfuegos, David Constant, David Dragone, Jose Gamero, Delfino Leon, Frank Rinaldo, Ian

Rubenstein, Derek Wrynn, and James Young.

50.     Prior to October, 2013 and after February 4, 2014, many of those individuals were

employed by Navillus performing work covered by the Local 46 Contract. For example, the

following employees were employed by Navillus to perform the same lather work that they

performed for ACS:

- Ian Rubenstein was employed by Navillus from February 26, 2013 through January 28, 2014 and by ACS during the weeks ending on January 14 and 21, 2014.
- Frank Rinaldo was employed by Navillus from January 31, 2012 through September 25, 2012 and by ACS during the weeks ending on November 26 and December 23, 2013.
- David Dragone was employed by Navillus from February 28, 2012 through July 29, 2014 and by ACS during the weeks ending on December 24, and 31, 2013  and January 7, 21, 28 and February 2, 2014.
- Ezequiel Arias was employed by Navillus from August 27, 2012 through October 29, 2013 and by ACS during the weeks ending on December 24, 2013.
- Vincent Cienfuegos was employed by Navillus from June 30, 2012 through November 19, 2013 and by ACS during the weeks ending on November 12 and 26, December 3 and 10, 2013.

18

51.    ACS, Time Square, and Navillus interchange employees who perform work

covered by the Union Contracts. ACS employees Fabian Haredia, Tashi Tsering, Leandro

Andrade, and John Fisher were all employed by Navillus before they were sent to ACS to

perform the same concrete laborer work that they had performed for Navillus or Time Square.

**ACS Managerial Employees Were Previously Employed by Navillus**

52.    ACS managers have been employed by Navillus, Time Square, HDK or all three

companies:

1.    <u>Patrick Corcoran</u>: On January 24, 2014, Mr. Corcoran applied for a NYC DOB
Site Safety license as an employee of Navillus, stating that he had been a super-
intendent for Navillus since December 1, 2001. The letter from Navillus
supporting Mr. Corcoran's application was signed by John Kuefner as the Project
Manager for Navillus. Mr. Kuefner's signature was notarized by Hazelyn L.
Corcoran. Mr. Corcoran's January 22, 2014 application was supported by a letter
from Time Square in which Mr. Corcoran was identified as an employee of Time
Square Construction and Development for the period October 1, 2012 through
May 1, 2013. This letter was from Mr. Kuefner and stated that while employed
by Time Square, Mr. Corcoran was paid through a "payroll company" known as
HDK.

On February 11, 2014, twelve working days later, Mr. Corcoran applied to the
NYC DOB for a Site Safety Manager License stating that since February 1, 2014
he had been an employee of ACS. The letter supporting his application for this
license was signed by John Kuefner as the Project Manager for ACS. Mr.
Kuefner's ACS signature was again notarized by Hazelyn L. Corcoran.

2.    <u>John Kuefner</u>: Mr. Kuefner identified himself in correspondence to NYC DOB
on behalf of Mr. Corcoran as a Project Manager for Navillus on January 24, 2014
and a Project Manager for ACS on February 14, 2014. Mr. Kuefner's LinkedIn
page identifies him as having worked for Navillus from April, 2010 to May, 2013
and then for ACS from June, 2013 to the present as Director of Operations,
Project Manager. Mr. Kuefner appears to have begun working for ACS three
months prior to its inception. On January 22, 2014, Mr. Kuefner submitted a
letter to the NYC DOB in which he identified himself as a Project Manager for
Time Square Construction and Development.

3.    <u>Hazelyn Corcoran, a/k/a Hazelyn L. Villaga</u>: Ms. Corcoran is identified as the
representative for ACS on May 14, 2014 correspondence to the NYC DOB
regarding the 551 West 21st Street job and is also identified as a Navillus

employee prior to that in various internet listings. Ms. Corcoran is also listed as the representative for ACS for the 421 Kent Avenue project, giving ACS's address as a residential address at 314 East 41st Street, Apt. #103C, New York, NY. Ms. Corcoran was the notary public for letters written to the NYC DOB by Mr. Kuefner concerning Patrick Corcoran on behalf of Time Square Construction and Development, Navillus, and ACS.

4.  John Brennan: Mr. Brennan reports on LinkedIn that he has been a Yard Manager for ACS from January, 2014 to the present and has also been employed by Navillus from June, 2012 to the present as a Yard Manager. Prior to June, 2012 Mr. Brennan worked for Navillus in its Account Department.

**ACS Gave Its Initial Address as a Residential Apartment Chosen to Cloak its Relationship to Navillus, Time Square and HDK; ACS Is Now Located Only 100 Yards from the Navillus Yard in Astoria Where it Has Ready Access to Navillus Construction Equipment and Materials**

53.  The initial ACS address was in an apartment at 314 East 41st Street, Apt. #103C, New York, NY, which is owned by Kathleen O'Sullivan who, on information and belief, is the wife or daughter of Donal O'Sullivan, the oldest brother among the owners of Navillus, Time Square, and HDK. Hazelyn L. Corcoran identified that address as her ACS "office" when in fact she was located at the offices of Navillus. The Defendants could have used the Navillus or the Time Square offices for ACS but sought to hide ACS's connection with those companies by utilizing an apartment address that would be more difficult to trace to the O'Sullivans.

54.  ACS now lists its address as 26-01 First Street, Astoria, NY, where it maintains an office, a yard, and a warehouse. This address is less than 100 yards from the Navillus facility at 27-02 First Street, Astoria, NY. This proximate location is not a coincidence and enables ACS to utilize Navillus equipment and materials as needed to perform concrete construction jobs.

**ACS, Time Square, and Navillus Share the Same Equipment and Customers and Sought to Hide Their Alter Ego Status**

55.  Time Square, Navillus, and ACS have shared the following equipment, personnel, and facilities, and have worked jointly on the same construction projects, doing covered work:

20

A.   A 2000 Mitsubishi Galant, Vehicle Identification Number ("VIN #")
4A3AA46GXYE160671, license plate number EDG8674, was registered to
Navillus in 2008. The previous plate number for that vehicle was DTJ1809. The
same vehicle—with the same VIN # and plate number DTJ1809—was registered
to Time Square in 2006.

B.   Time Square operated a truck, VIN # 1GPD7H1J3TJ503709, with plate number
18613MA, which is registered to Navillus.

C.   Navillus routinely marks equipment used at project sites that belong to the
company with the spray-painted identifiers "NAV" or "NA" or "NAVILLUS"
and Time Square marks its equipment with "TS." In, or about, August 2012,
construction equipment painted with "NAV" was being utilized by employees
employed by Time Square performing bargaining unit work.

D.   In, or about, August 2012, a Time Square truck was loaded at a facility operated
by Navillus. In, or about, August 2012, another Time Square truck was parked in
a yard operated by Navillus.

E.   In, or about, August 2012, workers at a Navillus facility operating a truck with
Time Square markings at a Navillus facility, and also operating a forklift at a
Navillus facility.

56.   Concrete construction companies utilize expensive pieces of equipment called

"forms" to assist the pouring of concrete. Navillus utilizes forms from a company known as

Doka on its construction jobs. Navillus paints its Doka forms with the letter "N" to show that it

is owned by Navillus. Navillus Doka forms marked with the letter "N" in red were utilized by

ACS on the job located at 551 West 21st Street, New York, NY.

57.   On March 5, 2014, approximately 100 Doka forms marked with the letter N at the

551 West 21st Street, New York, NY job were spray painted by an ACS employee with blue

paint to remove the red "N" from these forms. This was done as part of the consistent practice

by Navillus of hiding its dominion and control over ACS.

58.   ACS has engaged in harassment and intimidation of its employees to prevent

them from having any contact with labor unions. On or about July 10, 2014 at the Boston Road

Project, when Patrick Corcoran was upset that a union official had publicized a photograph of a

21

wall that collapsed during the construction of the project, he made all of the ACS Hispanic workers at the site give him their cell phones. He then inspected the records of messages sent and the contact list from these cell phones. This was done to intimidate these workers from having any communication with the unions that represent Navillus and as part of the campaign to keep secret its connections with ACS from the Plaintiff Funds.

**Navillus Has a Pattern and Practice of Performing its Construction Work Through Other Entities Owned or Controlled by the O'Sullivan Family**

59.    Navillus owners and principals Donal O'Sullivan and Kevin O'Sullivan also own Time Square. The Time Square website states that it has the ability to "self-perform" work such as "excavation, foundation, superstructure, masonry, curtain wall, window wall, and restoration" that is within the work described as covered work in the Union Contracts. A Disclosure Statement by a corporation 98% owned by Kevin and Donal O'Sullivan, dated October 31, 2011 and filed in the bankruptcy case *In re 785 Partners LLC,* Case No. 11-13702 (SMB)(S.D.N.Y.), asserted that, "The O'Sullivans own Time Square Construction & Development ('Time Square'), the construction manager for the residential development at the Property (the 'Project'), and Navillus Tile, Inc. ('Navillus'), a substantial subcontractor in the construction of the Project."

60.    Kevin O'Sullivan was vice president of Navillus before the formation of Time Square. He resigned from Navillus to become president of Time Square. Donal O'Sullivan shares in profits of Time Square as an owner and since in or about 2006 and especially after January 2, 2008, has repeatedly engaged in activities demonstrating that he is also an officer or director of Time Square.

61.    When Time Square was formed, key employees of both Navillus and Time Square moved between the companies. Fergal Conefrey worked at Navillus as a Project Executive from 1997-2005; he joined Time Square in 2005 as its Head of Construction. David

22

Ashe worked at Time Square from June to August, 2010 as a Sales Assistant; he then worked at Navillus as a Site Engineer from January to September, 2011; he was an Assistant Project Manager at Navillus starting in May, 2012; now David Ashe works for ACS. Anthony DelGreco and Thea Clark moved from Navillus to the Time Square payroll in 2006. Lenny Kelly transferred to Time Square from Navillus in 2007.

62.     Time Square, Navillus, and HDK have shared equipment, personnel, and facilities, and have worked jointly on the same construction projects, doing covered work. Time Square and Navillus are so tightly intertwined that in 2011 Kevin O'Sullivan publicly announced, in a video prepared by the O'Sullivans in connection with the sale of condominium units in a Time Square development known as 1 Vernon Jackson, that: "We have two construction companies, one called Navillus ... We have another company which is the development wing of our business, Time Square."

**AS AND FOR A FIRST CAUSE OF ACTION
BY THE LOCAL 46 FUNDS AGAINST
NAVILLUS, TIME SQUARE, AND ACS FOR VIOLATION OF ERISA**

63.     Plaintiffs repeat and re-allege the allegations of paragraphs 1 to 62 as if fully set forth herein.

64.     Section 515 of ERISA, 29 U.S.C. § 1145, requires "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement ... [to] make such contributions in accordance with the terms and conditions of such plan or such agreement."

65.     Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), provides that a civil action may be brought "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other

23

appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of this

subchapter or the terms of the plan."

66.     Section 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2), mandates that:

[i]n any action under this subchapter by a fiduciary for or on behalf of a plan to enforce
section 1145 of this title in which a judgment in favor of the plan is awarded, the court
shall award the plan

    (A) the unpaid contributions,
    (B) interest on the unpaid contributions,
    (C) an amount equal to the greater of--
          (i)  interest on the unpaid contributions, or
          (ii) liquidated damages ... in an amount not in excess of 20 percent ... of the
             amount determined by the court under subparagraph (A),
(D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
(E) such other legal or equitable relief as the court deems appropriate.

67.     Section 502(g)(1) of ERISA, 29 U.S.C. § 1132(g)(1), further provides that "[i]n

any action under this subchapter [other than one described in 502(g)(2)] by a participant,

beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fees and

costs of action ..."

68.     Upon information and belief, Navillus has underpaid the contributions that are

due and owing the Plaintiff Local 46 Funds on a systematic and continuous basis since at least

2008.

69.     Navillus' failure to remit contributions to the Local 46 Funds, for hours worked

by individuals performing covered work pursuant to the Local 46 Contract constitutes a failure to

make contributions in accordance with the terms of the applicable collective bargaining

agreements, in violation of §§ 502 and 515 of ERISA, 29 U.S.C. §§ 1132 and 1145, giving rise

to an action under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3).

70.     The Local 46 Funds have sustained losses believed to be in excess of Ten Million

Dollars ($10,000,000.00) based on the failure of Navillus to make the required contributions

24

based on the work performed on the jobs identified in this Complaint and other jobs currently unknown to Plaintiffs.

71.     ACS and Time Square are alter egos of Navillus and therefore Navillus, ACS, and Time Square are obligated, under the Local 46 Contract, to make contributions to the Local 46 Funds for covered work performed by ACS and Time Square employees.

## AS AND FOR A SECOND CAUSE OF ACTION BY THE CEMENT WORKERS FUNDS AGAINST NAVILLUS, TIME SQUARE, AND ACS FOR VIOLATION OF ERISA

72.     Plaintiffs repeat and re-allege the allegations of paragraphs 1 to 71 as if fully set forth herein.

73.     Upon information and belief, Navillus has underpaid the contributions that are due and owing the Plaintiff Cement Workers Funds on a systematic and continuous basis since at least 2008.

74.     Navillus' failure to remit contributions to the Cement Workers Funds, for hours worked by individuals performing covered work pursuant to the Cement Workers Contract constitutes a failure to make contributions in accordance with the terms of the applicable collective bargaining agreements, in violation of §§ 502 and 515 of ERISA, 29 U.S.C. §§ 1132 and 1145, giving rise to an action under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3).

75.     The Cement Workers Funds have sustained losses believed to be in excess of Ten Million Dollars ($10,000,000.00) based on the failure of Navillus to make the required contributions based on the work performed on the jobs identified in this Complaint and other jobs currently unknown to Plaintiffs.

25

76.     ACS and Time Square are alter egos of Navillus and therefore Navillus, ACS, and Time Square are obligated, under the Cement Workers Contract, to make contributions to the Cement Workers Funds for covered work performed by ACS and Time Square employees.

## AS AND FOR A THIRD CAUSE OF ACTION
## BY THE LOCAL 780 FUNDS AGAINST
## NAVILLUS, TIME SQUARE, AND ACS FOR VIOLATION OF ERISA

77.     Plaintiffs repeat and re-allege the allegations of paragraphs 1 to 76 as if fully set forth herein.

78.     Upon information and belief, Navillus has underpaid the contributions that are due and owing the Plaintiff Local 780 Funds on a systematic and continuous basis since at least 2008.

79.     Navillus' failure to remit contributions to the Local 780 Funds, for hours worked by individuals performing covered work pursuant to the Cement Masons Local 780 Contract constitutes a failure to make contributions in accordance with the terms of the applicable collective bargaining agreements, in violation of §§ 502 and 515 of ERISA, 29 U.S.C. §§ 1132 and 1145, giving rise to an action under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3).

80.     The Local 780 Funds have sustained losses believed to be in excess of Five Million Dollars ($5,000,000.00) based on the failure of Navillus to make the required contributions based on the work performed on the jobs identified in this Complaint and other jobs currently unknown to Plaintiffs.

81.     ACS and Time Square are alter egos of Navillus and therefore Navillus, ACS, and Time Square are obligated, under the Cement Masons Local 780 Contract, to make contributions to the Local 780 Funds for covered work performed by ACS and Time Square employees.

26

## AS AND FOR A FOURTH CAUSE OF ACTION
## BY THE CARPENTERS FUNDS AGAINST
## NAVILLUS, TIME SQUARE, AND ACS FOR VIOLATION OF ERISA

82.     Plaintiffs repeat and re-allege the allegations of paragraphs 1 to 81 as if fully set forth herein.

83.     Upon information and belief, Navillus has underpaid the contributions that are due and owing the Plaintiff Carpenters Funds on a systematic and continuous basis since at least 2008.

84.     Navillus' failure to remit contributions to the Carpenters Funds, for hours worked by individuals performing covered work pursuant to the Carpenters Contracts constitutes a failure to make contributions in accordance with the terms of the applicable collective bargaining agreements, in violation of §§ 502 and 515 of ERISA, 29 U.S.C. §§ 1132 and 1145, giving rise to an action under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3).

85.     The Carpenters Funds have sustained losses believed to be in excess of Ten Million Dollars ($10,000,000.00) based on the failure of Navillus to make the required contributions based on the work performed on the jobs identified in this Complaint and other jobs currently unknown to Plaintiffs.

86.     ACS and Time Square are alter egos of Navillus and therefore Navillus, ACS, and Time Square are obligated, under the Carpenters Contracts, to make contributions to the Carpenters Funds for covered work performed by ACS and Time Square employees.

## AS AND FOR A FIFTH CAUSE OF ACTION
## AGAINST NAVILLUS, ACS, AND TIME SQUARE FOR VIOLATION
## OF THE LMRA BY BREACHING THE LOCAL 46 CONTRACT

87.     Plaintiffs repeat and re-allege the allegations of paragraphs 1 to 86 as if fully set forth herein.

27

88.     Section 301(a) of the LMRA, 29 U.S.C. § 185(a), provides that:

Suits for violation of contracts between an employer and a labor organization
representing employees in an industry affecting commerce as defined in this chapter, or
between any such labor organizations, may be brought in any district court of the United
States having jurisdiction of the parties, without respect to the amount in controversy or
without regard to the citizenship of the parties.

89.     Section 301(b) of the LMRA, 29 U.S.C. § 185(b), provides that "[a]ny labor

organization which represents employees in an industry affecting commerce as defined in this

chapter and any employer whose activities affect commerce as defined in this chapter shall be

bound by the acts of its agents."

90.     The Local 46 Contract sets forth the work for which contributions should be made

to the Local 46 Funds.

91.     Article XII of the Local 46 Contract provides that the obligations of the collective

bargaining agreement are applicable not only to the signatory employer, Navillus, but to any

other employer to which Navillus has sold, leased, or otherwise transferred its business

operations. Navillus guaranteed that any successor employer to Navillus would be bound by all

the terms of the Local 46 Contract and would assume responsibility for the continuation of the

Local 46 Contract, including the obligation to contribute to the Local 46 Funds.  In addition, to

the extent Navillus subcontracts any work, it must be to an employer that is bound by all of the

provisions of the Local 46 Contract.

92.     Since at least 2008, Navillus, through its alter egos Time Square and ACS, has

performed work defined as "covered work" under the Local 46 Contract without making

contributions to the Local 46 Funds in connection with such work.

28

93.     Navillus, Time Square, and ACS failed to remit contribution payments to the

Local 46 Funds for the hours worked by employees performing covered work at the jobs

identified in this Complaint, and at other jobs now unknown to Plaintiffs.

94.     The Local 46 Funds have sustained losses of Ten Million Dollars

($10,000,000.00) based on the failure of Navillus, Time Square, and ACS to perform their

obligations under the Local 46 Contract.

### AS AND FOR A SIXTH CAUSE OF ACTION
### AGAINST NAVILLUS, ACS, AND TIME SQUARE FOR VIOLATION
### OF THE LMRA BY BREACHING THE CEMENT WORKERS CONTRACT

95.     Plaintiffs repeat and re-allege the allegations of paragraphs 1 to 94 as if fully

set forth herein.

96.     The Cement Workers Contract sets forth the work for which contributions

should be made to the Cement Workers Funds.

97.     Articles III, XI and XIX of the Cement Workers Contract require that

Navillus, any principal of Navillus, and any related employer contribute stated amounts to the

Cement Workers Funds for all hours of covered work.

98.     Since at least 2008, Navillus, through its alter egos Time Square and ACS, has

performed work defined as "covered work" under the Cement Workers Contract without making

contributions to the Cement Workers Funds in connection with such work.

99.     Navillus, Time Square, and ACS failed to remit contribution payments to the

Cement Workers Funds for the hours worked by employees performing covered work at the jobs

identified in this Complaint, and at other jobs now unknown to Plaintiffs.

100.     The Cement Workers Funds have sustained losses of Ten Million Dollars

($10,000,000.00) based on the failure of Navillus, Time Square, and ACS to perform their

obligations under the Cement Workers Contract.

### AS AND FOR A SEVENTH CAUSE OF ACTION AGAINST NAVILLUS, ACS, AND TIME SQUARE FOR VIOLATION OF THE LMRA BY BREACHING THE CEMENT MASONS LOCAL 780 CONTRACT

101.     Plaintiffs repeat and re-allege the allegations of paragraphs 1 to 100 as if fully

set forth herein.

102.     The Cement Masons Local 780 Contract sets forth the work for which

contributions should be made to the Local 780 Funds.

103.     Article VI, Section 3(g) of the Cement Masons Local 780 Contract provides

that the obligations to submit reports and/or contribute to the Local 780 Funds not only applies to

Navillus, but to its President, Vice President, Secretary-Treasurer, individual partner, employee

of the partnership, officer, stockholder, proprietor or employee of the corporation, company,

joint venture or proprietorship and that he or she shall be personally and individually obligated to

submit reports and/or pay the required contributions.

104.     Pursuant to Article VI, Section 3(d) of the Cement Masons Local 780

Contract, Navillus is contractually obligated to make available to the Local 780 Funds the

records of any of its affiliates, subsidiaries, alter egos, joint ventures or other related companies

for the purpose of determining whether Navillus has satisfied its payment obligations to the

Local 780 Funds. In addition, to the extent Navillus subcontracts any work, it must be to an

employer that is bound by all of the provisions of the Cement Masons Local 780 Contract.

30

105.     Since at least 2008, Navillus, through its alter egos Time Square and ACS, has

performed work defined as "covered work" under the Cement Masons Local 780 Contract

without making contributions to the Local 780 Funds in connection with such work.

106.     Navillus, Time Square, and ACS failed to remit contribution payments to the

Local 780 Funds for the hours worked by employees performing covered work at the jobs

identified in this Complaint, and at other jobs now unknown to Plaintiffs.

107.     The Local 780 Funds have sustained losses of Five Million Dollars

($5,000,000.00) based on the failure of Navillus, Time Square, and ACS to perform their

obligations under the Cement Masons Local 780 Contract.

### AS AND FOR AN EIGHTH CAUSE OF ACTION AGAINST
### NAVILLUS, ACS, AND TIME SQUARE FOR VIOLATION
### OF THE LMRA BY BREACHING THE CARPENTERS CONTRACTS

108.     Plaintiffs repeat and re-allege the allegations of paragraphs 1 to 107 as if fully

set forth herein.

109.     The Carpenters Contracts set forth the work for which contributions should be

made to the Carpenters Funds.

110.     Article XVIII of the Carpenters BCA Contract provides that if Navillus

performs Covered Work in its own name, or the name of another, over which, directly or

indirectly, it exercises any significant degree of ownership management or control, it is liable for

the terms and conditions of the Carpenters BCA Contract, including contributions owed to the

Carpenters Funds.

111.     Similarly, the Carpenters HASTA Contract, sets forth the type of work

covered by the agreement and for which contributions must be made to the Carpenters Funds.

Also, pursuant to the Carpenters HASTA Contract, Navillus agreed that "any firm, partnership or

31

corporation, engaging in work normally covered by this Agreement" and in which Navillus "has or acquires a financial interest shall be bound by the terms of the Agreement." The Carpenters HASTA Contract also provides that the terms of the agreement shall be binding on subcontractors used by Navillus.

112.    Since at least 2008, Navillus, through its alter egos Time Square and ACS, has performed work considered "covered work" under the Carpenters Contracts without making contributions to the Carpenters Funds in connection with such work.

113.    Navillus, Time Square, and ACS failed to remit contribution payments to the Carpenters Funds for the hours worked by employees performing covered work at the jobs identified in this Complaint, and at other jobs now unknown to Plaintiffs.

114.    The Carpenters Funds have sustained losses of Ten Million Dollars ($10,000,000.00) based on the failure of Navillus, Time Square, and ACS to perform their obligations under the Carpenters Contracts.

### AS AND FOR A NINTH CAUSE OF ACTION
### BY THE LOCAL 46 FUNDS AGAINST NAVILLUS, ACS, TIME SQUARE, DONAL O'SULLIVAN, KEVIN O'SULLIVAN, AND HELEN O'SULLIVAN FOR COMMON LAW FRAUD UNDER ERISA

115.    The Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 114 as if fully set forth herein.

116.    Helen O'Sullivan, the sister of Donal and Kevin O'Sullivan, is also an owner of HDK, Time Square, and Navillus.

117.    On information and belief, Helen O'Sullivan is also an owner of ACS.

118.    Helen O'Sullivan was responsible for creating and submitting to the Local 46 Funds the weekly payroll reports that purported to set forth the journeymen and apprentice hours spent performing covered work by employees of Navillus and its alter egos during each week.

32

Helen O'Sullivan signed the weekly reports to the Local 46 Funds each week during the period from May 2, 2008 through September 5, 2014. Each of those hundreds of weekly reports were false because they failed to include contributions for hours worked by alter egos of Navillus.

119.     Helen O'Sullivan, acting on her own and with the knowledge and participation of Donal O'Sullivan and Kevin O'Sullivan, made these false reports to the Local 46 Funds intending that the Local 46 Funds would rely upon these reports and fail to seek contributions from Navillus based upon the hours worked by Navillus alter egos, including Time Square and ACS.

120.     Navillus, ACS, Time Square, Donal O'Sullivan, Kevin O'Sullivan, and Helen O'Sullivan knowingly committed fraud against the Local 46 Funds by creating and orchestrating a scheme to omit hours worked in covered employment by ACS and Time Square employees from the contribution reports sent by Navillus to the Local 46 Funds.

121.     Donal O'Sullivan is the President of Navillus and a controlling corporate official of ACS and Time Square. Upon formation, ACS was located in a residential apartment owned by Kathleen O'Sullivan who, on information and belief, is Donal O'Sullivan's wife or daughter. ACS is now located in a place only 100 yards from the Navillus yard in Queens, New York.

122.     The asserted owner of ACS, Eoin Moriarty, is a friend of Donal O'Sullivan, Kevin O'Sullivan, and Helen O'Sullivan, and, along with Donal and Kevin O'Sullivan, is a member of the Kerryman's Patriotic & Benevolent Association and the Kerry Football Club of New York. Moriarty spent six years as a Controller for Navillus before being assigned by the O'Sullivans to act as the titular head of ACS.

33

123. ACS began performing significant concrete construction projects before it was legally formed as a Delaware limited liability company and before it was registered to do business in New York.

124. The Local 46 Funds conduct periodic audits of contributing employers. On multiple occasions, representatives of the Plaintiff Funds conducted audits of Navillus in which misrepresentations were made by representatives of Navillus concerning the presence of affiliated companies doing covered work under the Local 46 Contract. Specifically, when the Local 46 Funds conducted audits of Navillus, Navillus representatives falsely advised the auditors that Navillus had no affiliated companies.

125. Navillus, ACS, Time Square, Donal O'Sullivan, Kevin O'Sullivan, and Helen O'Sullivan made, or caused to be made, materially false representations and omissions of existing facts by filing false weekly contribution statements with the Plaintiff Funds that failed to disclose the hours being worked in covered employment through ACS and Time Square, thereby underpaying the amounts of contributions they knew to be owed.

126. Defendants ACS, Time Square, Donal O'Sullivan, Kevin O'Sullivan, and Helen O'Sullivan knew that Navillus was filing false reports and making substantial underpayments each week to the Local 46 Funds.

127. The Plaintiff Funds reasonably relied, to their detriment, on the material and false representations and omissions made by Navillus concerning the hours of covered work by ACS and Time Square.

128. Particular facts demonstrating the creation and the operation of ACS and Time Square as alter egos of Navillus are exclusively within the knowledge of Defendants Donal O'Sullivan, Kevin O'Sullivan, and Helen O'Sullivan.

34

129.     Defendants acted in an intentional and reckless manner, consciously disregarded the rights of the Plaintiff Funds, and showed wanton dishonesty and disregard of their civil obligations. The fraudulent acts committed by Defendants exhibit a high level of moral culpability aimed at the public.

130.     Defendants ACS, Time Square, Donal O'Sullivan, and Kevin O'Sullivan, are jointly and severally liable with Navillus for any contributions due and owing pursuant to §§ 502 and 515 of ERISA, 29 U.S.C. §§ 1132 and 1145, based on their knowing participation in a scheme to underpay Navillus' contributions to the Local 46 Funds in an amount to be proved at trial but believed, with interest, to be in excess of Ten Million Dollars ($10,000,000.00).

## AS AND FOR A TENTH CAUSE OF ACTION
### BY THE CEMENT WORKERS FUNDS AGAINST NAVILLUS, ACS, TIME SQUARE, DONAL O'SULLIVAN, KEVIN O'SULLIVAN, AND HELEN O'SULLIVAN FOR COMMON LAW FRAUD UNDER ERISA

131.     The Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 130 as if fully set forth herein.

132.     Helen O'Sullivan was responsible for creating and submitting to the Cement Workers Funds the weekly payroll reports that purported to set forth the journeymen and apprentice hours spent performing covered work by employees of Navillus and its alter egos during each week. Helen O'Sullivan signed the weekly reports to the Cement Workers Funds each week during the period from May 2, 2008 through September 5, 2014. Each of those hundreds of weekly reports were false because they failed to include contributions for hours worked by alter egos of Navillus.

133.     The Cement Workers Funds weekly contribution form included the following language immediately above the employer signature line which binds the employer and its

35

principals to make contributions to the Funds for each hour of employment performed within the

trade and geographical jurisdiction of the District Council:

> The Undersigned Employer hereby certifies that the information contained in this
> report and the attached schedule is true and correct, that the hours worked represent all
> hours worked by any cement and concrete workers in the employ of the named employer
> for the period specified.
>
> . . .
>
> The person signing this report on behalf of the Employer hereby consents to be
> personally bound by and to assume all of the terms and conditions, rights, liabilities and
> responsibilities of an employer in accordance with the provisions of the collective
> bargaining agreement currently in force with the District council of Cement and Concrete
> Workers composed of Locals Nos. 6-A, 18-A and 20 with the same force and effect as if
> fully set forth herein and warrants and represents that he has the authority to bind the
> Employer and the principals or members thereof. The Employer agrees to make all
> contributions in accordance therewith in the amount set forth on this report for each hour
> of employment performed within the trade and geographical jurisdiction of the District
> Council.

134.      Navillus, ACS, Time Square, Donal O'Sullivan, Kevin O'Sullivan, and Helen

O'Sullivan knowingly committed fraud against the Cement Workers Funds by creating and

orchestrating a scheme to omit hours worked in covered employment by ACS and Time Square

from the contribution reports sent by Navillus to the Cement Workers Funds.

135.      Donal O'Sullivan is the President of Navillus and a controlling corporate

official of ACS and Time Square. Upon formation, ACS was located in a residential apartment

owned by Kathleen O'Sullivan who, on information and belief, is Donal O'Sullivan's wife or

daughter. ACS is now located in a place only 100 yards from the Navillus yard in Queens, New

York.

136.      The asserted owner of ACS, Eoin Moriarty, is a friend of Donal O'Sullivan,

Kevin O'Sullivan, and Helen O'Sullivan, and, along with Donal and Kevin O'Sullivan, is a

member of the Kerryman's Patriotic & Benevolent Association and the Kerry Football Club of

New York. Moriarty spent six years as a Controller for Navillus before being assigned by the O'Sullivans to act as the titular head of ACS.

137.     ACS began performing significant concrete construction projects before it was legally formed as a Delaware limited liability company and before it was registered to do business in New York.

138.     The Cement Workers Funds conduct periodic audits of contributing employers. On multiple occasions, representatives of the Plaintiff Funds conducted audits of Navillus in which misrepresentations were made by representatives of Navillus concerning the presence of affiliated companies doing covered work under the Cement Workers Contract. Specifically, when the Cement Workers Funds conducted audits of Navillus, Navillus representatives falsely advised the auditors that Navillus had no affiliated companies.

139.     Navillus, ACS, Time Square, Donal O'Sullivan, Kevin O'Sullivan, and Helen O'Sullivan made, or caused to be made, materially false representations and omissions of existing facts by filing false weekly contribution statements with the Plaintiff Funds that failed to disclose the hours being worked in covered employment through ACS and Time Square, thereby underpaying the amounts of contributions they knew to be owed.

140.     Defendants ACS, Time Square, Donal O'Sullivan, Kevin O'Sullivan, and Helen O'Sullivan knew that Navillus was filing false reports and making substantial underpayments each week to the Cement Workers Funds.

141.     The Plaintiff Cement Workers Funds reasonably relied, to their detriment, on the material and false representations and omissions made by Navillus concerning the hours of covered work by ACS and Time Square.

37

142. Particular facts demonstrating the creation and the operation of ACS and Time Square as alter egos of Navillus are exclusively within the knowledge of Defendants Donal O'Sullivan, Kevin O'Sullivan, and Helen O'Sullivan.

143. Defendants acted in an intentional and reckless manner, consciously disregarded the rights of the Plaintiff Funds, and showed wanton dishonesty and disregard of their civil obligations. The fraudulent acts committed by Defendants exhibit a high level of moral culpability aimed at the public.

144. Defendants ACS, Time Square, Donal O'Sullivan, and Kevin O'Sullivan are jointly and severally liable with Navillus for any contributions due and owing pursuant to §§ 502 and 515 of ERISA, 29 U.S.C. §§ 1132 and 1145, based on their knowing participation in a scheme to underpay Navillus' contributions to the Cement Workers Funds in an amount to be proved at trial but believed, with interest, to be in excess of Ten Million Dollars ($10,000,000.00).

### AS AND FOR AN ELEVENTH CAUSE OF ACTION
### BY THE LOCAL 780 FUNDS AGAINST NAVILLUS, ACS, TIME SQUARE, DONAL O'SULLIVAN, KEVIN O'SULLIVAN, AND HELEN O'SULLIVAN
### FOR COMMON LAW FRAUD UNDER ERISA

145. The Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 144 as if fully set forth herein.

146. Helen O'Sullivan was responsible for creating and submitting to the Local 780 Funds the weekly payroll reports that purported to set forth the journeymen and apprentice hours spent performing covered work by employees of Navillus and its alter egos during each week. Helen O'Sullivan signed the weekly reports to the Local 780 Funds each week during the period from May 2, 2008 through September 5, 2014. Each of those hundreds of weekly reports

38

were false because they failed to include contributions for hours worked by alter egos of

Navillus.

147.     The Local 780 Funds weekly contribution form included the following

language:

> The Employer hereby agrees that the reflected herein are made in conformity with Article
> VI, a copy reproduced on the reverse side of this remittance form, dealing with
> contributions to the Fund(s) in the standard Collective Bargaining Agreement with the
> Union and Employers who executed this Agreement and Declaration of Trust
> establishing the Fund(s) and the employer agrees that it is the employer's legal
> commitment to make the enclosed contributions.

148.     Navillus, ACS, Time Square, Donal O'Sullivan, Kevin O'Sullivan, and Helen

O'Sullivan knowingly committed fraud against the Local 780 Funds by creating and

orchestrating a scheme to omit hours worked in covered employment by ACS and Time Square

employees from the contribution reports sent by Navillus to the Local 780 Funds.

149.     Donal O'Sullivan is the President of Navillus and a controlling corporate

official of ACS and Time Square. Upon formation, ACS was located in a residential apartment

owned by Kathleen O'Sullivan who, on information and belief, is Donal O'Sullivan's wife or

daughter. ACS is now located in a place only 100 yards from the Navillus yard in Queens, New

York.

150.     The asserted owner of ACS, Eoin Moriarty, is a friend of Donal O'Sullivan,

Kevin O'Sullivan, and Helen O'Sullivan, and, along with Donal and Kevin O'Sullivan, is a

member of the Kerryman's Patriotic & Benevolent Association and the Kerry Football Club of

New York. Moriarty spent six years as a Controller for Navillus before being assigned by the

O'Sullivans to act as the titular head of ACS.

39

151.    ACS began performing significant concrete construction projects before it was legally formed as a Delaware limited liability company and before it was registered to do business in New York.

152.    The Local 780 Funds conduct periodic audits of contributing employers. On multiple occasions, representatives of the Local 780 Funds conducted audits of Navillus in which misrepresentations were made by representatives of Navillus concerning the presence of affiliated companies doing covered work under the Cement Masons Local 780 Contract. Specifically, when the Local 780 Funds conducted audits of Navillus, Navillus representatives falsely advised the auditors that Navillus had no affiliated companies.

153.    Navillus, ACS, Time Square, Donal O'Sullivan, Kevin O'Sullivan, and Helen O'Sullivan made, or caused to be made, materially false representations and omissions of existing facts by filing false weekly contribution statements with the Local 780 Funds that failed to disclose the hours being worked in covered employment through ACS and Time Square, thereby underpaying the amounts of contributions they knew to be owed.

154.    Defendants ACS, Time Square, Donal O'Sullivan, Kevin O'Sullivan, and Helen O'Sullivan knew that Navillus was filing false reports and making substantial underpayments each week to the Local 780 Funds.

155.    The Plaintiff Local 780 Funds reasonably relied, to their detriment, on the material and false representations and omissions made by Navillus concerning the hours of covered work by ACS and Time Square.

156.    Particular facts demonstrating the creation and the operation of ACS and Time Square as alter egos of Navillus are exclusively within the knowledge of Defendants Donal O'Sullivan, Kevin O'Sullivan, and Helen O'Sullivan.

40

157.     Defendants acted in an intentional and reckless manner, consciously disregarded the rights of the Plaintiff Funds, and showed wanton dishonesty and disregard of their civil obligations. The fraudulent acts committed by Defendants exhibit a high level of moral culpability aimed at the public.

158.     Defendants ACS, Time Square, Donal O'Sullivan, and Kevin O'Sullivan are jointly and severally liable with Navillus for any contributions due and owing pursuant to §§ 502 and 515 of ERISA, 29 U.S.C. §§ 1132 and 1145, based on their knowing participation in a scheme to underpay Navillus' contributions to the Local 780 Funds in an amount to be proved at trial but believed, with interest, to be in excess of Five Million Dollars ($5,000,000.00).

## AS AND FOR A TWELFTH CAUSE OF ACTION
## BY THE CARPENTERS FUNDS AGAINST NAVILLUS, ACS, TIME SQUARE, DONAL O'SULLIVAN, KEVIN O'SULLIVAN, AND HELEN O'SULLIVAN FOR COMMON LAW FRAUD UNDER ERISA

159.     The Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 158 as if fully set forth herein.

160.     Helen O'Sullivan was responsible for creating and submitting to the Carpenters Funds the weekly payroll reports that purported to set forth the journeymen and apprentice hours spent performing covered work by employees of Navillus or its alter egos during each week.  Helen O'Sullivan signed the weekly reports to the Carpenters Funds each week during the period from May 2, 2008 through September 5, 2014.  Each of those hundreds of weekly reports were false because they failed to include contributions for hours worked by alter egos of Navillus.

161.     Navillus, ACS, Time Square, Donal O'Sullivan, Kevin O'Sullivan, and Helen O'Sullivan knowingly committed fraud against the Carpenters Funds by creating and

41

orchestrating a scheme to omit hours worked in covered employment by ACS and Time Square from the contribution reports sent by Navillus to the Carpenters Funds.

162. Donal O'Sullivan is the President of Navillus and a controlling corporate official of ACS and Time Square. Upon formation, ACS was located in a residential apartment owned by Kathleen O'Sullivan who, on information and belief, is Donal O'Sullivan's wife or daughter. ACS is now located in a place only 100 yards from the Navillus yard in Queens, New York.

163. The asserted owner of ACS, Eoin Moriarty, is a friend of Donal O'Sullivan, Kevin O'Sullivan, and Helen O'Sullivan, and, along with Donal and Kevin O'Sullivan, is a member of the Kerryman's Patriotic & Benevolent Association and the Kerry Football Club of New York. Moriarty spent six years as a Controller for Navillus before being assigned by the O'Sullivans to act as the titular head of ACS.

164. ACS began performing significant concrete construction projects before it was legally formed as a Delaware limited liability company and before it was registered to do business in New York.

165. The Carpenters Funds conduct periodic audits of contributing employers. On multiple occasions, representatives of the Carpenters Funds conducted audits of Navillus in which misrepresentations were made by representatives of Navillus concerning the presence of affiliated companies doing covered work under the Carpenters Contracts. Specifically, when the Carpenters Funds conducted audits of Navillus, Navillus representatives falsely advised the auditors that Navillus had no affiliated companies.

166. Navillus, ACS, Time Square, Donal O'Sullivan, Kevin O'Sullivan, and Helen O'Sullivan made, or caused to be made, materially false representations and omissions of

42

existing facts by filing false weekly contribution statements with the Carpenters Funds that failed

to disclose the hours being worked in covered employment through ACS and Time Square,

thereby underpaying the amounts of contributions they knew to be owed.

167.     Defendants ACS, Time Square, Donal O'Sullivan, Kevin O'Sullivan, and

Helen O'Sullivan knew that Navillus was filing false reports and making substantial

underpayments each week to the Carpenters Funds.

168.     The Plaintiff Carpenters Funds reasonably relied, to their detriment, on the

material and false representations and omissions made by Navillus concerning the hours of

covered work by ACS and Time Square.

169.     Particular facts demonstrating the creation and the operation of ACS and Time

Square as alter egos of Navillus are exclusively within the knowledge of Defendants Donal

O'Sullivan, Kevin O'Sullivan, and Helen O'Sullivan.

170.     Defendants acted in an intentional and reckless manner, consciously

disregarded the rights of the Plaintiff Funds, and showed wanton dishonesty and disregard of

their civil obligations. The fraudulent acts committed by Defendants exhibit a high level of moral

culpability aimed at the public.

171.     Defendants ACS, Time Square, Donal O'Sullivan and Kevin O'Sullivan, are

jointly and severally liable with Navillus for any contributions due and owing pursuant to §§ 502

and 515 of ERISA, 29 U.S.C. §§ 1132 and 1145, based on their knowing participation in a

scheme to underpay Navillus' contributions to the Carpenters Funds in an amount to be proved at

trial but believed, with interest, to be in excess of Ten Million Dollars ($10,000,000.00).

43

**WHEREFORE**, the Plaintiffs respectfully demand judgment as follows:

1.      On the First Cause of Action pursuant to § 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2), a judgment against NAVILLUS TILE, INC., d/b/a NAVILLUS CONTRACTING, ADVANCED CONSTRUCTION SOLUTIONS, LLC, d/b/a ACS-NY LLC, and TIME SQUARE CONSTRUCTION, INC., in favor of the Local 46 Funds for unpaid contributions as determined to be due based upon Navillus' underreporting to the Local 46 Funds of covered work hours performed by Navillus' alter ego entities, as identified in this litigation, which is believed to be approximately Ten Million Dollars ($10,000,000.00), plus: (i) interest on the unpaid contributions, and (ii) an amount equal to the greater of (x) the interest on the unpaid contributions, or (y) liquidated damages in an amount of 20% of the unpaid contributions.

2.      On the Second Cause of Action pursuant to § 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2), a judgment against NAVILLUS TILE, INC., d/b/a NAVILLUS CONTRACTING, ADVANCED CONSTRUCTION SOLUTIONS, LLC, d/b/a ACS-NY LLC, and TIME SQUARE CONSTRUCTION, INC., in favor of the Cement Workers Funds for unpaid contributions as determined to be due based upon Navillus' underreporting to the Cement Workers Funds of covered work hours performed by Navillus' alter ego entities, as identified in this litigation, which is believed to be approximately Ten Million Dollars ($10,000,000.00), plus: (i) interest on the unpaid contributions, and (ii) an amount equal to the greater of (x) the interest on the unpaid contributions, or (y) liquidated damages in an amount of 20% of the unpaid contributions.

3.      On the Third Cause of Action pursuant to § 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2), a judgment against NAVILLUS TILE, INC., d/b/a NAVILLUS CONTRACTING, ADVANCED CONSTRUCTION SOLUTIONS, LLC, d/b/a ACS-NY LLC, and TIME

SQUARE CONSTRUCTION, INC., in favor of the Local 780 Funds for unpaid contributions as determined to be due based upon Navillus' underreporting to the Local 780 Funds of covered work hours performed by Navillus' alter ego entities, as identified in this litigation, which is believed to be approximately Five Million Dollars ($5,000,000.00), plus: (i) interest on the unpaid contributions, and (ii) an amount equal to the greater of (x) the interest on the unpaid contributions, or (y) liquidated damages in an amount of 20% of the unpaid contributions.

4.      On the Fourth Cause of Action pursuant to § 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2), a judgment against NAVILLUS TILE, INC., d/b/a NAVILLUS CONTRACTING, ADVANCED CONSTRUCTION SOLUTIONS, LLC, d/b/a ACS-NY LLC, and TIME SQUARE CONSTRUCTION, INC., in favor of the Carpenters Funds for unpaid contributions as determined to be due based upon Navillus' underreporting to the Carpenters Funds of covered work hours performed by Navillus' alter ego entities, as identified in this litigation, which is believed to be approximately Ten Million Dollars ($10,000,000.00), plus: (i) interest on the unpaid contributions, and (ii) an amount equal to the greater of (x) the interest on the unpaid contributions, or (y) liquidated damages in an amount of 20% of the unpaid contributions.

5.      On the Fifth Cause of Action against NAVILLUS TILE, INC., d/b/a NAVILLUS CONTRACTING, ADVANCED CONTRACTING SOLUTIONS, LLC, d/b/a ACS-NY, and TIME SQUARE CONSTRUCTION, INC. pursuant to § 301 of the LMRA, 29 U.S.C. § 185, a judgment against those entities in favor of the Local 46 Funds for Ten Million Dollars ($10,000,000.00) plus interest.

6.      On the Sixth Cause of Action against NAVILLUS TILE, INC., d/b/a NAVILLUS CONTRACTING, ADVANCED CONTRACTING SOLUTIONS, LLC, d/b/a ACS-NY, and TIME SQUARE CONSTRUCTION, INC. pursuant to § 301 of the LMRA, 29 U.S.C. § 185, a

judgment against those entities in favor of the Cement Workers Funds for Ten Million Dollars ($10,000,000.00) plus interest.

7.     On the Seventh Cause of Action against NAVILLUS TILE, INC., d/b/a NAVILLUS CONTRACTING, ADVANCED CONTRACTING SOLUTIONS, LLC, d/b/a ACS-NY, and TIME SQUARE CONSTRUCTION, INC. pursuant to § 301 of the LMRA, 29 U.S.C. § 185, a judgment against those entities in favor of the Local 780 Funds for Five Million Dollars ($5,000,000.00) plus interest.

8.     On the Eighth Cause of Action against NAVILLUS TILE, INC., d/b/a NAVILLUS CONTRACTING, ADVANCED CONTRACTING SOLUTIONS, LLC, d/b/a ACS-NY, and TIME SQUARE CONSTRUCTION, INC. pursuant to § 301 of the LMRA, 29 U.S.C. § 185, a judgment against those entities in favor of the Carpenters Funds for Ten Million Dollars ($10,000,000.00) plus interest.

9.     On the Ninth Cause of Action for fraud, pursuant to the federal common law under ERISA, against NAVILLUS TILE, INC., d/b/a NAVILLUS CONTRACTING, ADVANCED CONSTRUCTION SOLUTIONS, LLC, d/b/a ACS-NY LLC, TIME SQUARE CONSTRUCTION, INC., DONAL O'SULLIVAN, KEVIN O'SULLIVAN, and HELEN O'SULLIVAN, a judgment, jointly and severally, against each of said Defendants in favor of the Local 46 Funds for Ten Million Dollars ($10,000,000.00) plus interest.

10.     On the Tenth Cause of Action for fraud, pursuant to the federal common law under ERISA, against NAVILLUS TILE, INC., d/b/a NAVILLUS CONTRACTING, ADVANCED CONSTRUCTION SOLUTIONS, LLC, d/b/a ACS-NY LLC, TIME SQUARE CONSTRUCTION, INC., DONAL O'SULLIVAN, KEVIN O'SULLIVAN, and HELEN

O'SULLIVAN, a judgment, jointly and severally, against each of said Defendants in favor of the Cement Workers Funds for Ten Million Dollars ($10,000,000.00) plus interest.

11.     On the Eleventh Cause of Action for fraud, pursuant to the federal common law under ERISA, against NAVILLUS TILE, INC., d/b/a NAVILLUS CONTRACTING, ADVANCED CONSTRUCTION SOLUTIONS, LLC, d/b/a ACS-NY LLC, TIME SQUARE CONSTRUCTION, INC., DONAL O'SULLIVAN, KEVIN O'SULLIVAN, and HELEN O'SULLIVAN, a judgment, jointly and severally, against each of said Defendants in favor of the Local 780 Funds for Five Million Dollars ($5,000,000.00) plus interest.

12.     On the Twelfth Cause of Action for fraud, pursuant to the federal common law under ERISA, against NAVILLUS TILE, INC., d/b/a NAVILLUS CONTRACTING, ADVANCED CONSTRUCTION SOLUTIONS, LLC, d/b/a ACS-NY LLC, TIME SQUARE CONSTRUCTION, INC., DONAL O'SULLIVAN, KEVIN O'SULLIVAN, and HELEN O'SULLIVAN, a judgment, jointly and severally, against each of said Defendants in favor of the Carpenters Funds for Ten Million Dollars ($10,000,000.00) plus interest.

13.     An award to Plaintiffs of their reasonable attorneys' fees and costs, pursuant to § 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2), and;

14.     Such other and further relief, including injunctive relief, as the Court deems just and proper.

47

## DEMAND FOR JURY TRIAL

Please take notice that Plaintiffs demand a trial by jury of each of their claims in this

action.

Dated: October 16, 2014
New York, New York

KENNEDY, JENNIK & MURRAY, P.C.
Attorneys for Plaintiffs

By:    Thomas M. Kennedy
       Susan M. Jennik
       Serge Ambroise
113 University Place, 7th Floor
New York, N.Y. 10003
(212) 358-1500
tkennedy@kjmlabor.com
sjennik@kjmlabor.com
sambroise@kjmlabor.com